**IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

| | |
|---|---|
| **JOHN CALDERAIO** | **CIVIL ACTION** |
| Plaintiff, | |
| **v.** | |
| **CENTRAL BUCKS SCHOOL DISTRICT** | **NO. 23-4218** |
| Defendant. | |

## MEMORANDUM

**Perez, J.**                                                    **February 10, 2026**

Defendant Central Bucks School District ("CBSD" or "District") moves for summary judgment on Plaintiff John Calderaio's claims under 42 U.S.C. § 1983, Title IX, and Pennsylvania negligence law. Plaintiff alleges that while he was a student at Central Bucks West High School, District officials repeatedly received information suggesting that choir teacher Joseph Ohrt was blurring professional boundaries with students and posed a risk of sexual misconduct, yet CBSD failed to investigate, document, supervise, or discipline in a manner that would protect students. The District disputes both the scope of its notice and the reasonableness of its responses, and it also contends it is immune from Plaintiff's negligence claim under the Political Subdivision Tort Claims Act ("PSTCA"). Viewing the record in the light most favorable to Plaintiff, the Court concludes that the District's motion largely depends on asking the Court to do what it cannot do at summary judgment: weigh credibility, disregard or minimize record evidence, and draw disputed inferences in the District's favor. The record contains substantial evidence from which a reasonable jury could conclude that the District repeatedly received serious warning signs about boundary violations and grooming behavior, yet failed to respond in a way that protected students. These

1

disputes are not marginal—they go to the heart of the case—and must be resolved by a jury, not the Court. Summary judgment will therefore be denied.

## I.    FACTUAL BACKGROUND[1]

Plaintiff John Calderaio is 27 years old, born in December 1997.[2] He attended Central Bucks West High School ("CB West") from his sophomore year through his 2016 graduation, and he turned 18 during his senior year.[3]

Defendant CBSD employed music teacher Joseph Ohrt beginning in the 1987–1988 school year and transferred him to Central Bucks West High School for the 1991–1992 school year, where he remained until resigning on March 16, 2022, following his arrest for indecent assault of students, corruption of minors, and related offenses.[4] Plaintiff met Ohrt as a 15-year-old 10th grade student in choir class. Ohrt taught Plaintiff choir each of his three high school years and served as his homeroom teacher in his junior and senior years.[5] During Plaintiff's enrollment, Jason Bucher was CB West principal, Todd Cantrell was the house principal, and MaryKate Shrack was Plaintiff's counselor through December of his junior year.[6]

---

[1] Certain exhibits are filed under seal by Plaintiff at ECF 36 and 29. For ease of reference, the Court cites the public exhibit numbering and descriptions in ECF 35, which contain placeholders that correspond to the sealed filings.
[2] John Calderaio Deposition, ECF 35-3 at 7:23-24.
[3] *Id.* at 21:23-24, 24:19-20.
[4] Ohrt Deposition, ECF 35-4 at 24:6-16, 27:7-23, 30:6-13, 35:21-23.
[5] ECF 35-3 at 109:4-15, 110:3-11.
[6] Shrack Deposition, ECF 35-5 at 12:11-13:10.

1.    **The District was Aware Plaintiff was an At-Risk Student**

Plaintiff's parents separated in 2012 and later divorced. From ninth through twelfth grades, Plaintiff lived at times with each parent and also with friends.[7] Plaintiff testified his mother was an emotionally abusive alcoholic and the family experienced financial instability.[8]

Principal Bucher testified he knew Plaintiff's home circumstances changed in ninth grade. Shortly after Plaintiff's mother Terry "came out of a treatment center," Principal Bucher met with Plaintiff's mother, a Children and Youth Services ("CYS") case worker, and Plaintiff's therapist social worker.[9] Bucher further testified Plaintiff was absent and tardy an "excessive" and "concerning" amount, including 70 to 80 times during his senior year alone. Bucher was also aware of the family's financial problems and that Plaintiff sometimes lived with people other than his parents.[10]

Counselor Shrack, meanwhile, characterized Plaintiff as a "high flying" student and her records noted he was "homeless" and "couch surfing."[11] Shrack recognized Plaintiff's unstable home situation could impact academics and that he was "sick, emotionally as well as physically."[12] House Principal Cantrell was also aware Plaintiff was an "at-risk" student with significant attendance issues, and Cantrell met with counselors about academics, attendance, and Plaintiff's strained relationships with his parents. Cantrell testified he understood from CBSD training that at-risk students are more vulnerable to grooming.[13]

---

[7] ECF 35-3 at 14:7-15, 20:4, 15:5-23, 16:19-17:16, 18:17-19:3.
[8] *Id.* at 18:7-10, 19:4-9, 19:24-20:23.
[9] Bucher Deposition, ECF 35-6 at 45:22-46:4; ECF 35-3 at 46:616, 47:19-24, 194:20-195:1; Terry Calderaio Deposition, ECF 35-7 at 50:15-51:18.
[10] ECF 35-6, 53:17-54:6, 57:5-11, 193:16-24, 194:15-19.
[11] ECF 35-5 at 35:22-36:8, 38:20-39:7, 39:15-40:14.
[12] *Id.* at 41:23-42:11.
[13] ECF 35-7 at 14:14-18, 13:23-14:10, 14:6-3, 21:18-20, 14:19-22.

Ohrt knew Plaintiff's mother was an alcoholic and that Plaintiff moved between residences; he also believed Plaintiff's father was in prison.[14] Ohrt knew Plaintiff was frequently absent, lacked a "winter coat," and was in "financial need," and concluded that Plaintiff "needed some help."[15] Plaintiff's expert opines that professional standards require administrators to protect at-risk students from adults who cultivate dependency through special advantages and attention.[16] Human Resources ("HR") Director Andrea Didio Hauber stated she heard "rumors" that Ohrt used inappropriate language with students, bullied students, crossed professional boundaries, blurred the teacher-student line, tried to be students' "buddy," and was described as "creepy."[17]

### 2.  Ohrt's Alleged Grooming Conduct and District-Sanctioned Access to Plaintiff

During Plaintiff's sophomore year, Ohrt began soliciting personal details about Plaintiff's family, including his mother's alcoholism and the family's financial difficulties. Plaintiff viewed his relationship with Ohrt as paternal.[18] Beginning in Plaintiff's junior year, Ohrt pulled him out of class and the lunchroom to the choir room. Rumors circulated about a sexual relationship, and Plaintiff became increasingly isolated from friends and family.[19] Plaintiff also described peers "teas[ing] and taunt[ing]" him.[20]

Ohrt brought Plaintiff to an art studio next to Ohrt's home on multiple occasions during Plaintiff's junior and senior years.[21] Principal Bucher had previously given Ohrt permission to bring students to the studio with their parents and had permitted studio visits for choir members

---

[14] ECF 35-4 at 101:18-102:9, 99:18-20.
[15] *Id.* at 102:8-103:12.
[16] Dr. Kozak Education Expert Report, ECF 35-15 at 56.
[17] Hauber Deposition, ECF 35-9 at 148:10-149:19.
[18] ECF 35-3 at 115:1-116:10, 123:4-124:24.
[19] *Id.* at 118:15-119:23, 119:13-23, 124:10-17.
[20] *Id.* at 170:12-19.
[21] *Id.* at 149:18-24, 152:24-153:4, 166:11–14.

before Plaintiff was Ohrt's student.[22] Plaintiff's expert opines that the principal did not require permission slips or verification of parent attendance, contrary to established practices.[23]

Ohrt admitted he was "attracted" to Plaintiff in high school, wanted a relationship with him, and told Plaintiff he loved him. Ohrt also acknowledged hugging Plaintiff at school and described "strattling (sic) the line."[24] Plaintiff stated that Ohrt encouraged him to study music education and suggested he could influence Plaintiff's prospects of obtaining Ohrt's position.[25]

### 3. Ohrt Begins to Sexually Abuse Plaintiff During Junior Year

Beginning in Plaintiff's junior year, Ohrt repeatedly sexually abused Plaintiff at CB West in the choir room, men's dressing room, and Ohrt's office.[26] Plaintiff described conduct including genital rubbing over clothing, kissing his neck, hugging and grabbing buttocks, restraining him, and "grinding" against him while he played piano. Plaintiff testified that Ohrt patted his stomach and slid his hand to graze/rub Plaintiff's penis over clothing.[27]

Defendant's expert Dr. Meghan Musselman reported that the relationship "turned sexual toward the end of [Plaintiff's] junior year," describing conduct including hugging, pushing Plaintiff's face into his neck, movement toward buttocks during hugs, brushing a hand over Plaintiff's genitals over pants, and Ohrt pushing an erect penis into Plaintiff's back.[28]

---

[22] ECF 35-4 at 68:3-11, 69:15-19, 70:14-20, 70:14-24, 73:16-21, 78:8-14.
[23] ECF 35-15 at 55.
[24] ECF 35-4 at 120:2-20, 128:22-129:5, 148:5-22.
[25] ECF 35-3 at 128:24-129:4, 130:1-12.
[26] *Id.* at 135:21-136:1, 136:18-23, 137:4–13.
[27] *Id.* at 139:4-7, 105:18-106:1, 107:3-4, 137:9-19, 112:11-113:6, 108:3-20, 112:12-20, 112:11-113:6.
[28] Dr. Musselman Report, ECF 35-16 at 8.

### 4.    District Policies Addressing Boundaries and Discipline

CBSD Policy 824 (titled "Maintaining Professional Adult/Student Boundaries"), adopted in February 2016, states that adults must maintain professional relationships and addresses "precursor grooming and other boundary-blurring behaviors."[29] Policy violations "can" result in discipline up to and including termination.[30] HR Director Hauber testified she was "certain" a similar policy predated February 2016 and that boundary-crossing circumstances could be grooming "red flags." She also testified that boundary principles were taught in professional practices during teacher certification.[31]

The District identified Policy 317 (Conduct/Disciplinary Procedures) as its teacher discipline policy and Policy 317.1 (Educator Misconduct) as its employee misconduct and abuse-reporting policy. Policy 317 provides that the District may impose "progressive penalties," including verbal and written warnings, reprimand, suspension, demotion, dismissal, and pursuit of civil or criminal sanctions. Policy 317.1 defines various forms of educator misconduct, requires reporting of suspected abuse, and provides that the District must cooperate with the Pennsylvania Department of Education during review or investigation and promptly provide relevant information and evidence upon request.

Plaintiff's expert describes progressive discipline as a tool for escalating consequences for policy violations related to student safety.[32] Hauber testified the severity of the infraction dictates where to begin in the progressive-discipline continuum. She testified that in applying discipline she would review the personnel file to assess prior similar behavior and determine next steps, and

---

[29] ECF 35-20.
[30] *Id.*
[31] ECF 35-9 at 64:2-6, 75:14-23, 68:19-69:2.
[32] ECF 35-15 at 57.

that repeat conduct may warrant suspension or termination.[33] Hauber concluded that despite Ohrt's long history of issues, it did not "appear as if [progressive discipline] occurred," that the District lacked "fidelity" because principals appeared to "start over," and that the District's response was "not working."[34]

Hauber also discussed how disciplinary-related documents were supposed to be maintained in the employee's personnel file, and that it is "absolutely imperative" to keep complete personnel records in order to apply progressive discipline. She explained that complete records are necessary to protect student safety and to enable the District to respond to inquiries from the School Board, prosecutors, or law enforcement.[35]

Hauber further testified that when she began as HR Director in 2014, she learned that principals kept separate files at their buildings.[36] She instructed administrators that there was only one official personnel file and that original disciplinary documents were to be provided to HR.[37] Plaintiff's expert opined that maintaining building-level files makes it difficult to identify patterns of misconduct.[38] Hauber also stated that additional misconduct records concerning Ohrt were later obtained through a subpoena of the criminal-defense discovery produced in connection with his prosecution.[39]

---

[33] ECF 35-9 at 143:13-16, 31:2-9, 51:5-11, 51:24-52:7, 51:12-23.
[34] *Id.* at 143:4-7, 146:3-12, 146:13-18.
[35] *Id.* at 53:20-23, 185:24-186:4, 56:7-11, 56:12-14.
[36] *Id.* at 54:7-10, 55:14-18.
[37] *Id.* at 10–13.
[38] ECF 35-15 at 23.
[39] ECF 25-9 at 163:13-164:4.

5.    **Criminal Prosecution of Ohrt and Related Facts**[40]

On February 22, 2022, Central Bucks Regional Police charged Ohrt with invasion of privacy and obstruction of justice based on allegations that Ohrt secretly recorded Plaintiff—by then an adult—in various states of undress and attempted to destroy evidence.[41] On March 7, 2022, police filed additional charges alleging that Ohrt sexually abused two minors who were CBSD students, including a sixth-grade student at Linden Elementary School, during the 1991–1992 school term, and a 13-year-old student. Ohrt was convicted and sentenced in June 2023 to 2½ to 5 years of incarceration followed by five years of probation, and he was eligible for parole on December 12, 2025.[42]

Additionally, Ohrt acknowledged that in 1998 he was arrested in Hopewell Township, New Jersey for attempting to flee and elude police, and that same 13-year old later identified as a victim of abuse was present in the vehicle with him at the time.[43] HR Director Andrea Didio Hauber testified that she could not recall when FBI background clearances became required beyond the point of hire, stating that clearances were initially obtained only upon hire and that additional requirements were implemented later, sometime in the 2010s.[44]

6.  **District Misconduct Records and Notice Concerning Ohrt (1992 and After)**

Superintendent Winters documented that he, Ohrt, the then-principal, and a union representative held a conference after a student alleged that Ohrt "grabbed" her neck, and he

---

[40] For privacy reasons, the Court uses pseudonyms for certain non-party individuals who were minors at the time of the alleged conduct, even though they are now adults and their names appear in parts of the public record.
[41] ECF 35-21.
[42] ECF 36-10; ECF 35-4 at 11:16-20, 11:21-22.
[43] *Id.* at 154:1-6; *Id.* at 155:5-12.
[44] ECF 35-9 at 136:7-10, 136:17-23.

concluded that no policy violation occurred due to "inconsistencies" in the accounts.[45] On February 2, 1992, the mother of a sixth-grade student (hereafter "Student A"), who was later identified as a victim in Ohrt's criminal prosecution, reported to Principal Tenaglia that Ohrt had grabbed her son "behind the neck with great pressure" and "kneed [him] in the backside," and that Ohrt repeatedly removed her son and another student from class under the pretext of "helping" him.[46] Tenaglia testified he did not attempt to identify other students referenced in the letter. Tenaglia further testified that grabbing/kneeing was an "escalation" and "red flag," but he did not file a police report and assumed no injury.[47]

Tenaglia denied that Student A's mother reported sexual assault, but in a February 10, 1992 letter to Ohrt, he restricted Ohrt from working with students "on an individual or small group basis" and directed him not to have "physical contact" unless necessary, and stated the complaint was "one in a series of concerns" about Ohrt's professional relationships with students. Hauber testified the Student A letter was sealed in an envelope in the personnel file.[48]

In his Declaration, Student A asserts that Ohrt isolated him for one-on-one sessions, engaged in physical contact including touching buttocks and genitals over and under clothing, and that he reported the incident to his mother and met with administrators.[49] Students A's mother declared she told Tenaglia in person that Ohrt pulled her son's pants down and touched his penis, and that she soon learned Ohrt was reassigned to the high school.[50] Tenaglia testified he left Student A in Ohrt's class because music was required.[51] Former assistant principal Brian Caughie

---

[45] *Id.* at 17-20.
[46] ECF 35-20 at 568-571.
[47] Tenaglia Deposition, ECF 35-10 at 110:12-14, 93:14-22, 93:23-94:2, 96:8-12, 96:1415, 96:10-12, 97:4-9.
[48] ECF 35-9 at 122:1-6.
[49] [Student A] Declaration, ECF 35-19 ¶¶ 3-8.
[50] ECF 35-19 ¶¶ 5, 9, 10.
[51] ECF 35-10 at 107:4-14.

testified the Student A materials described physical abuse and grooming behavior and should have prompted investigation, consultation with HR and superintendent, and a ChildLine report.[52]

In May 1996, a principal documented that Ohrt made inappropriate sexual comments to a male student, but the letter was kept out of the personnel file.[53] In May 1999, Principal Stone warned Ohrt about parent-reported concerns and that similar incidents would carry disciplinary consequences. Hauber testified that both letters should have been in the personnel file.[54] In May 2008, principal Munnelly directed Ohrt to be professional and avoid vulgarities; Munnelly kept the memo out of the personnel file and did not formally discipline Ohrt.[55] Munnelly testified prior history would have been a "tipping point" for recommending more serious discipline. Hauber again testified the memo should have been in the personnel file.[56]

In November 2013, House Principal Powers documented chamber choir student complaints of demeaning statements, intimidation, favoritism, and discomfort.[57] Hauber testified she expected a personnel-file record of the meeting convened to address those complaints, but none existed. In fall 2014, principal Bucher wrote Ohrt about parent concerns and noted they were similar to concerns raised the prior year; he described the letter as "prior to a written warning."[58] Bucher testified he had problems supervising Ohrt and understood Ohrt had a reputation for bullying that could warrant discipline.[59] Hauber testified she heard reports that Ohrt bullied students, crossed boundaries, and that "creepy" was used frequently to describe him.[60]

---

[52] Caughie Deposition, ECF 35-11 at 28:9-13, 28:24-29:3, 29:4-10.
[53] ECF 35-20; ECF 35-9 at 132:16–133:2.
[54] ECF 35-9 at 131:7-12, 139:13-15.
[55] ECF 35-12 at 30:21-24, 60:22-61:1.
[56] *Id.* at 61:18-62:2; ECF 35-9 at 141:16-21.
[57] *See* ECF 35-20.
[58] *Id.*; ECF 35-6 at 115:11-14.
[59] ECF 35-6 at 108:18-109:4, 136:14-16, 136:21-137:6, 148:14-18.
[60] ECF 35-9 at 149:1-18.

Bucher testified he lacked access to personnel files, relied on HR for history, and treated matters as "first offenses"; he testified that he would have escalated had he known of prior similar conduct and that he should have known about the 1992 Student A restrictions.[61] Hauber testified: "I don't know why anyone would write a letter that states that you can't be alone with children but you remain in the classroom."[62]

### 6. Plaintiff's Father's Complaint and the 2016 ChildLine Report

Plaintiff's father testified that during Plaintiff' junior year he became concerned his son was disengaged, distancing from family, and spending substantial time with Ohrt. Plaintiff's father met with Principal Bucher and told him the relationship seemed "inappropriate or not suitable" and "not proper."[63] He testified Plaintiff spent "way too much time after hours" with Ohrt and exhibited "anti-family behavior."[64] Plaintiff testified Bucher did not question him and dismissed his father's concerns as "nonsense."[65] Bucher testified he recalled an "unannounced" meeting in which the father was upset Plaintiff did not spend much time at home.[66]

In April 2016, an anonymous ChildLine report raised concerns that Ohrt had a history of befriending "troubled male high school students," that students spent time after school with him, and that he had previously attempted to "engage coax" a student who had recently lost his father. The report further stated that Plaintiff was "very close" with Ohrt and had maintained a close relationship with him for approximately three years, including spending time with him outside of school. The reporter expressed the belief that Ohrt "grooms these children and could potentially

---

[61] *Id.* at 65:10-12, 65:22-66:6, 66:19-67:1, 92:8-13, 115:15-19, 84:18-24, 92:4-16.
[62] ECF 35-9 at 127:17-20.
[63] ECF 35-8 at 95:6-15, 110:10-13; *see also* ECF 35-3 at 132:1-13.
[64] ECF 35-8 at 109:14-21.
[65] ECF 35-3 at132:19-22.
[66] ECF 35-6 at 167:7-20.

be abusing them," and suggested there could be incriminating information in Ohrt's school email account.[67]

Bucher stated that he notified HR Director Hauber, while Hauber stated she had no knowledge of the report, though she would "expect" to be notified. Bucher also stated that he took no action in response: he did not provide the detective information about prior misconduct, did not investigate, did not interview Ohrt or Plaintiff, did not increase oversight, and did not notify Plaintiff's parents.[68]

House Principal Caughie explained that when a principal receives a report of grooming or assault, the principal should contact HR and the assistant superintendent, conduct interviews involving at least two administrators, and provide a written summary of findings to senior leadership.[69]

Plaintiff testified that after Ohrt learned about the ChildLine report, Ohrt told him "I need your support," and Plaintiff told a detective there was "nothing going on."[70] Plaintiff's expert opines administrators should know sexual-abuse victims frequently deny abuse due to fear of labeling or shunning. Furthermore, Plaintiff's expert opines, investigating the report more likely than not would have prevented further harassment and abuse after graduation.[71]

---

[67] ECF 35-21; ECF 35-6 at 169:19-170:4, 171:1-24.
[68] ECF 35-6 at 172:4-8, 173:7-13, 202:1-3; ECF 35-9 at 89:11-14, 91:9-13, 90:6-13.
[69] ECF 35-11 at 25:12-26:1, 26:6-13, 30:7-10, 31:4-7, 61:7-19, 66:14-19.
[70] ECF 35-4 at 167:21-168:4, ECF 35-3 at 141:16-18.
[71] ECF 35-15 at 13.

## II. LEGAL ANALYSIS

### A. Section 1983 (*Monell*) — Summary Judgment Is Denied

Section 1983 provides a cause of action against a person who, acting under color of state law, deprives another of a federal right. *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005). The Court first identifies the right at issue and then determines whether the evidence could support a constitutional deprivation. *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (quoting *Nicini v. Mora*, 212 F.3d 798, 806 (3d Cir. 2000)).

A school district is not liable under § 1983 on a respondeat superior theory. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014). Municipal liability attaches only if the plaintiff proves an unconstitutional policy or a well-settled custom that was the "moving force" behind the constitutional injury. *Chambers v. City of Phila.*, No. 23-0137, 2024 WL 870574, at *4 (E.D. Pa. Feb. 29, 2024) (citing *Thomas*, 749 F.3d at 222). A plaintiff need not identify a formally adopted policy. *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019). Liability may rest on a "custom"—a course of conduct so permanent and well settled as to have the force of law—even if not approved by a decisionmaker in writing. *Id.*

A plaintiff must also show the municipal "policy or custom was the 'proximate cause' of his injuries." *Id.* (citation omitted). Causation may be shown where a "known but uncorrected custom" made the violation reasonably probable. *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990). In *Bielevicz*, for example, the plaintiffs alleged that police officers arrested and detained them unlawfully pursuant to customary practices, and the Third Circuit explained that where a plaintiff offers evidence of a municipal custom and a link between that custom and the alleged

injury, "causation is a question for the jury" unless the record forecloses any reasonable inference of a causal connection. *Id.* at 851.

Similarly, in *Beck v. City of Pittsburgh*, the plaintiff brought an excessive-force claim against a police officer and supported his municipal liability claim with evidence of multiple prior civilian complaints against the same officer and the City's repeated failure to meaningfully address them. 89 F.3d 966, 973–76 (3d Cir. 1996). The Third Circuit held that a reasonable jury could infer a municipal custom of tolerating misconduct from the pattern of complaints and the inadequacy of the City's internal response. *Id.*

Likewise, here, the District's effort to parse each event in isolation, and to argue that no single incident, standing alone, establishes notice or deliberate indifference, goes to the weight of the evidence and the inferences a factfinder should draw from the totality of the record. Where the evidence would permit a finding that a pattern of complaints and inadequate responses reflected a known but uncorrected custom, the Court may not resolve competing inferences regarding causation in the moving party's favor at summary judgment. *See Bielevicz*, 915 F.2d at 851. Instead, a jury is entitled to consider the record as a whole and draw commonsense inferences from a pattern of repeated warnings followed by repeatedly inadequate responses.

The District relies on *Kline ex rel. Arndt v. Mansfield*, 255 F. App'x 624 (3d Cir. 2007) (nonprecedential), to argue it is entitled to judgment as a matter of law. This reliance is misplaced. Kline is readily distinguishable based on both the evidence it contained and the critical evidence that was absent. There, the plaintiff conceded that neither she nor her parent ever complained to school officials about the teacher's conduct, and the court emphasized that no district official possessed actual knowledge of the intimate or sexual nature of the relationship. *Id.* at 625-627. The § 1983 theory, therefore, rested on officials' awareness of boundary-crossing in a general

sense: that the seventh-grade student frequently visited the teacher's sixth-grade classroom (including by cutting band rehearsal), that other teachers thought she spent "too much time" there, that seventh-grade teachers eventually barred her from the room, and that the school did not consistently enforce a hallway-access rule. *Id.* at 628. Upon that evidentiary showing, the Third Circuit held summary judgment was appropriate because, "at best," the proof suggested negligence in failing to recognize a risk—not a custom or policy of deliberate indifference. *Id.* at 629.

Here, by contrast, Plaintiff points to evidence from which a jury could find that District officials were placed on notice of materially different and far more serious concerns than students spending "too much time" with a teacher. The record includes alleged reports of sexual touching and grooming-type conduct, not minor boundary issues or routine discipline matters. Plaintiff also presents evidence that, despite recurring concerns, the District failed to document misconduct, escalate its response, or ensure continuity of supervision. That is precisely the gap Kline found dispositive: the absence of notice of sexual misconduct. Here, by contrast, Plaintiff's theory is that the District's response to known red flags and allegations reflected a longstanding practice of non-escalation and non-documentation that made later abuse reasonably probable. The record contains substantial evidence that administrators lacked access to complete disciplinary history and that the District's recordkeeping and escalation mechanisms were inconsistently applied.

On this record, a reasonable jury could conclude that the District's manner of responding to repeated concerns about Ohrt's conduct and boundary violations amounted to a well-settled practice, and that this practice reflected deliberate indifference to the risk of teacher sexual misconduct. The District's own HR Director testified, unequivocally, that the system designed to protect students was not functioning as intended. She concluded that progressive discipline did not "appear" to have occurred, that the District lacked "fidelity" in responding to repeated concerns,

and that administrators repeatedly "start[ed] over" rather than escalating consequences. In her words, the system was "not working"—and whether to credit that testimony is a question for the jury.[72] The record also includes evidence that key misconduct documents were kept out of the personnel file, undermining the District's ability to identify patterns and escalate responses.

The District asks the Court to conclude that a jury could not reasonably connect dots that the District itself failed to connect for decades. In short, Defendant's argument depends on separating out each incident in isolation, ignoring the cumulative force of repeated complaints, and resolving contested inferences in its favor. That is not the summary judgment standard. On this record, the District is not entitled to judgment as a matter of law, and the Court has little difficulty concluding that a reasonable jury could find a custom of deliberate non-escalation and non-documentation that made the resulting harm foreseeable.

### B.  Title IX — Summary Judgment Is Denied

Title IX is enforceable through an implied private right of action for damages against a school district for teacher-on-student sexual harassment. *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 359 (3d Cir. 2005). A school district is not automatically vicariously liable for a teacher's misconduct; rather, liability attaches only where an official with authority to take corrective measures—an "appropriate person"—had "actual notice" or "actual knowledge" of facts indicating a substantial risk of sex-based harassment and responded with deliberate indifference. *Id.* at 360; *see also Doe v. Loyalsock Twp. Sch. Dist.*, No. 4:21-CV-01343, 2022 WL 1110310, at *3 (M.D. Pa. Apr. 13, 2022).

---

[72] ECF 35-9 at 31:2-9, 51:5-11, 51:12–23, 51:24-52:7, 143:4-7, 146:3-18, 185:24-186:4.

"Actual knowledge" does not require that the District know the full extent of abuse or receive a detailed disclosure from the plaintiff. *Bostic*, 418 F.3d at 360–61. It is sufficient if the evidence would permit a jury to find that the District knew underlying facts indicating a sufficiently substantial danger of sexual misconduct by the teacher. *Id.*; *Loyalsock*, 2022 WL 1110310, at *3. Moreover, the deliberate indifference inquiry is contextual: the question is whether the District's response, in light of what it knew at the time, was clearly unreasonable. *See Bostic*, 418 F.3d at 360.

*Harden v. Rosie* affirmed summary judgment for a school district where officials with authority knew of crude or inappropriate remarks and generalized concerns about professionalism, but those concerns were not sufficiently similar to a later-discovered sexual relationship to establish actual notice of a substantial risk of sexual abuse. 99 A.3d 950, 959–63 (Pa. Commw. Ct. 2014). The court emphasized that certain observations suggesting a sexual relationship were not reported to, or known by, the officials who had authority to take corrective action, defeating the "actual knowledge" requirement. *Id.* at 957–58. And where reports were made to appropriate officials, the district undertook corrective measures, undermining any inference of deliberate indifference. *Id.* at 962–63.

Here, by contrast, Plaintiff identifies record evidence that administrators received information a jury could reasonably view as implicating grooming or sexual-misconduct risk, not merely vulgarity or classroom harshness (though the record reflects that conduct by Ohrt as well). The record includes reports of boundary-crossing conduct, favoritism toward male students, and allegations framed in explicitly sexual terms, along with evidence of a broader pattern of demeaning and bullying behavior by Ohrt. A reasonable jury could find that the District had actual

knowledge of facts indicating a substantial danger to students and nonetheless failed to take reasonable protective steps.

Most notably, the 2016 ChildLine report did not merely raise generalized professionalism concerns. Rather, it *explicitly* warned that Ohrt "grooms" students and "could potentially be abusing them," and it pointed investigators toward potentially incriminating evidence in his school email account. A jury could reasonably find that a report framed in these terms demanded immediate and serious intervention. Yet, viewing the record in Plaintiff's favor, the principal took no meaningful protective action at all. He did not interview Plaintiff or Ohrt, did not increase oversight, did not notify parents, and did not provide detectives information about prior allegations. House Principal Caughie testified that a report of grooming/assault should trigger contacts to HR and the assistant superintendent, and an investigation should be conducted by multiple administrators with a written summary to leadership. Additionally, it is disputed whether HR was notified of the ChildLine report.

The District emphasizes that during the 2016 investigation, Plaintiff gave law enforcement a statement denying that Ohrt had engaged in any misconduct. But the significance of that denial (and whether it rendered the District's response reasonable) presents factual issues a jury may weigh, particularly given expert evidence that victims frequently deny abuse. On this record, a reasonable jury could find (1) actual knowledge by an appropriate person, and (2) a response that was clearly unreasonable in light of the known circumstances. Summary judgment is therefore denied on Count II.

### C.  Negligence and PSTCA Immunity — Summary Judgment Is Denied

CBSD next argues it is immune under the PSTCA, 42 Pa. Cons. Stat. §§ 8541–8542, and that the sexual-abuse exception does not apply because Plaintiff cannot prove qualifying conduct occurred before he turned 18. The District's position turns on a factual premise: that before Plaintiff turned eighteen, Ohrt's conduct toward Plaintiff was limited to nonsexual hugging.

Plaintiff's evidence, however, creates a genuine dispute as to whether Ohrt engaged in sexual touching while Plaintiff was still a minor. Plaintiff testified that beginning in junior year—before his 18th birthday in December of senior year—Ohrt repeatedly sexually abused him at school, including rubbing Plaintiff's genitals over clothing, grabbing buttocks, kissing/nuzzling his neck, and pressing/grinding an erect penis against him. Defendant's expert similarly documented that the relationship "turned sexual toward the end of [Plaintiff's] junior year," including brushing a hand over Plaintiff's genitals over pants and pushing an erect penis into his back.

Those disputes are material to whether the statutory exception can be satisfied on the record as framed and, in any event, they are not resolvable at summary judgment, where the Court may not make credibility determinations. *Sec. & Data Techs., Inc. v. Sch. Dist. of Philadelphia*, 145 F. Supp. 3d 454, 470 (E.D. Pa. 2015). On this record, the District's attempt to recharacterize the evidence as nonsexual is a credibility argument reserved for trial, not a basis for summary judgment.

Separate from the immunity dispute, there is evidence from which a reasonable jury could find the District breached duties relating to supervision, documentation, and response to warning signs and that those omissions were a substantial factor in Plaintiff's harm. Plaintiff's expert opines

that, had the District investigated the 2016 ChildLine report, it more likely than not would have prevented further harassment and abuse after graduation. There is also evidence that the District's progressive discipline and recordkeeping systems were not applied with fidelity, which a jury could view as contributing to the risk of harm.

Because the negligence claim depends on disputed facts about what occurred before Plaintiff's 18th birthday and disputed inferences about breach and causation, summary judgment is denied on Count III.

## II.    CONCLUSION

For the reasons set forth above, Defendant CBSD's Motion for Summary Judgment is denied. The District's motion rests on the premise that decades of complaints, warnings, restrictions, and documented boundary concerns—many involving physical contact and sexualized behavior toward male students—can be disaggregated, discounted, or ignored one by one, such that no reasonable jury could find notice, indifference, or causation. However, at summary judgment, the Court may not sanitize the record by disaggregating it into pieces small enough to ignore. The evidence does not describe an isolated lapse or a close judgment call. It describes a sustained pattern of warning signs met with fragmentation, inaction, and institutional amnesia, precisely the type of record that forecloses summary judgment. Viewing the record in the light most favorable to Plaintiff, a reasonable jury could find that the District maintained a custom or practice that was deliberately indifferent to the risk of teacher sexual misconduct and that such failures were a moving force behind Plaintiff's injury. A reasonable jury could further find that an appropriate person had actual notice of facts indicating a substantial danger to students and responded with deliberate indifference, and it could find that Ohrt's misconduct toward Plaintiff

began while he was a minor, precluding immunity and requiring resolution of Plaintiff's negligence claim by a factfinder.